Quinlan, Regina L., J.
The plaintiffs, Jay Bergeron and Joanne Crowley, have filed for certiorari review, seeking to annul the Conservation Commission of the Town of Barnstable’s (“Commission”) decision granting an Order of Conditions to build a “dinghy” or kayak dock at 59 Short Beach Road in Centerville, Massachusetts (“the premises”). Alternatively, pursuant to G.L.c. 231A, §1, the plaintiffs seek a declaratory judgment stating that they are entitled to construct a permanent timber pier with seasonal ramp and float on the premises.[2] For the following reasons, the plaintiffs’ Motion for Judgment on the Pleadings is ALLOWED, and the case is remanded to the Commission for further findings.
BACKGROUND
The premises is a .15-acre lot with approximately sixty feet of frontage. The premises is improved with a single-family home, and its yard is entirely landscaped up to the concrete retaining wall along the Mean High Water Line. The premises is located along a 250-foot cove off of the Centerville River.
The area surrounding the premises is mapped habitat for shellfish and shore birds and encompasses several protected resources areas, including a Salt Marsh, Riverfront, Intertidal Beach, Land Under Water, and Land Subject to Coastal Storm Flowage.
a) Applicable Regulations
The plaintiffs’ proposed project must comply with the Massachusetts Wetlands Protection Act (the “WPA”), G.L.c. 131, §40 and Chapter 703, Code of the Town of Barnstable (the “Bylaw”). The WPA is designed “to protect the private and public water supply; to protect the ground water; to prevent storm damage; to prevent pollution; to protect land containing shellfish; to protect wildlife habitat; and to protect the fisheries." In consideration of these interests, the WPA sets forth guidelines for the construction of limited projects, including wharves, docks, and piers. 310 Code Mass. Regs. 10.53(3)(j). Review of such limited projects, however, remains within the discretion of the local regulatory authorities. 310 Code Mass. Regs. 10.53(3).
The Bylaw is also designed “to protect wetlands and related water resources, and fheir values and functions, including, but not limited to [the same interests protected by the . . . erosion and sedimentation control . . . [and] recreation . . .” §237-1. The Bylaw recognizes that “construction, use, and maintenance of docks, piers, and walkways are likely to have a significant or cumulative effect on the wetland resources *152 values of storm damage prevention, fin and shell fisheries, wildlife habitat erosion and sediment control, and recreation.” §703-1(c).
In particular, the Bylaw states that “[p]iers, depending on their length, can have an adverse impact on recreation by interfering with recreational boating activities,” and that “(a]ny proposal that affects navigation is likely to have significant or cumulative adverse effect on recreation.” §703-l(J). To promote recreation and navigability, §703-4(J)(l) creates a pier length performance standard, which provides that “[n]o dock, including pier, floats, dolphins, etc., shall extend further from shore than: (1) A point equaling 1 /2 of the lot’s water frontage measured in a straight line between the lot’s waterfront corners.” For the same reason, §703-4(J)(4) establishes a channel width standard, limiting a pier’s length by “[t]wenty percent of the width of a linear waterway at MLW except where the location of the existing channel shall dictate otherwise.”
The Bylaw also recognizes that propeller dredging generated by boat use at piers can significantly alter natural sedimentation, resulting in destruction of shellfish habitat and erosion of banks and marshes. §703-1(D). Section 703-4(M)(2) therefore creates a berth depth performance standard designed to prevent sedimentation and erosion; it states that . . the following depth requirements must be met for motorized vessels ... (2) In areas determined not to be high-value shellfish habitat, the minimum depth under the draft of the boat must be 12 inches at MLW.”
b) The Plaintffs’ Proposed Project
On February 11, 2008, the plaintiffs filed a Notice of Intent to construct a permanent timber pier with a seasonal sixteen-foot ramp and a ten-by-eighteen-foot float extending from the premises into the Centerville River for a total distance of one hundred feet. The plaintiffs also requested authorization to berth a boat with a 12-foot draft on the outside of the proposed pier and a non-motorized skiff or day sailer on the inside. The plaintiffs, however, recognized that their proposed plan failed to comply with the pier length standard under §703-4(J)(l), the channel width standard under §703-4(J)(4), and the berth depth standard under §703-4(M)(2).[3]
In support of the variances from §§703-4(J)(l) and (J)(4), the plaintiffs argued that the premises has unique shallow bathymetry because of a curve in the shoreline. To satisfy the float depth standard under §703-4(H), the plaintiffs maintained that their pier had to extend one hundred feet from the premises. The plaintiffs also contended that the premises’ dimensions were delineated before the Bylaw’s adoption, resulting in an unusually short width to which it would be unjust to apply modern pier length standards.
The plaintiffs further claimed that the proposed project would not obstruct traffic in the Centerville River because it would be located in a dead-end cove and would not extend beyond that line connecting the ends of the abutters’ piers. The plaintiffs maintained that the proposed pier would not adversely affect shellfish or shorebird habitat because the construction site is rated as “0" for shellfish habitat, with the nearest shellfish habitat in excess of ”4" located 2,750 feet away, and because the premises has no dxy beach, dune, or bank which could support shorebird habitat.[4] Finally, the plaintiffs noted that forty-eight existing piers are located near the premises and that the Centerville River is permitted for maintenance dredging to support recreational traffic.[5]
With respect to the variance from the depth standard under §703-4(M)(2), the plaintiffs’ engineer opined that operating a boat at the pier, as long as it did not ground at low tide, would not have a significant, cumulative adverse impact on any of the Bylaw’s protected interests in light of the permitted conditions under the §703-4(M) and the grandfathered existing conditions in the area.
c) The Commission’s Decision
In addition to the plaintiffs’ application, the Commission considered a letter from the Massachusetts Division of Marine Fisheries (“Marine Fisheries”) and an e-mail from Barnstable’s Assistant Harbormaster. Marine Fisheries expressed several concerns with the plaintiffs’ project, including that a motorized boat could propeller-dredge shellfish habitat, that construction equipment could adversely impact the salt marsh and intertidal habitat, that permanent piling could provide habitat for invasive species and increase potential for trash accumulation, and that planking would decrease light penetration. The Assistant Harbormaster voiced no objections to the proposed pier, but noted that the mooring floats directly in front of and to the sides of the premises were already permitted to other vessels.
After reviewing the plaintiffs’ application and the above-referenced letters, the Commission held a public hearing on March 4, 2008. During this hearing, the Commission discussed plaintiffs’ lack of mooring rights near the premises. The Commission also expressed disapproval with the plaintiffs’ decision to forgo a shellfish study, but it recognized that the area surrounding the premises has a shellfish habitat value of “0" due to pollution. The Commission concluded that berthing a boat at the proposed site would stir up sediment surrounding the premises and release pollutants, which would remain suspended in the water due to the cove’s lack of flow.
The Commission then discussed that it had not granted any waivers from the Bylaw since its adoption, and that an applicant would have to demonstrate substantial need to obtain a variance. In assessing the individual characteristics of the plaintiffs’ proposal, a Commissioner made the following statement, which, *153 from the record, the court implies the entire Commission considered:
My overall concern is that I don’t want anywhere in our town to have any water sheet, water resource, to have in this town be a primary purpose of a parking lot for boats. And part of the argument that seems to be presented today is this is a low shellfish habitat; you know, we’re not getting in the way of stuff; it’s sort of mucky, it’s a dead-end. Well, let’s make a parking lot for boats. And so I’m, I’m not too keen about that... I’d have no trouble with it as a non-motorized dock.
Following this, the Commission engaged in some discussion as to whether the pier, if granted, should be permanent or seasonal. Ultimately, the Commission voted to deny the plaintiffs’ request for variances, but to allow a dock that could accommodate a non-motorized watercraft.
On March 21, 2008, the Commission issued an Order of Conditions (“OOC”) that approved a much shorter “dinghy” or kayak pier subject to twenty-four special conditions of approval. The Commission found that the proposed pier failed to comply with the Bylaw’s overall length, channel width, and motorcraft depth standards. The Commission, however, decided to facilitate boating at the premises by approving a modified plan for a dock compliant with the Bylaw’s length and depth requirements. The modified plan required shortening the pier to sixty feet, reducing the float to eight feet by twelve feet, and constructing four-feet by four-feet piles. In justifying its decision not to grant the plaintiffs’ variances, the Commission simply stated that “it found that adherence to the Regulations is the best way to minimize downstream impacts to the high-value shellfish habitat in the Centerville River.”
Plaintiffs immediately filed this action, and sought a superseding order of conditions from the Massachusetts Department of Environmental Protection (“DEP”). The DEP granted the plaintiffs a superseding order on January 15, 2009.[6]
DISCUSSION
The Plaintiffs bring their Motion for Judgment on the Pleadings pursuant to G.L.c. 249, §4 and Superior Court Standing Order 1-96. Under G.L.c. 249, §4, this court may reverse, remand, or modify an agency decision if the “substantial rights of any party may have been prejudiced” because the agency decision is based on an error of law or on unlawful procedure, is arbitrary and capricious or unwarranted by facts found by the agency, or is unsupported by substantial evidence. Merisme v. Board of Appeal on Motor Vehicle Liab. Policies and Bonds, 27 Mass.App.Ct. 470, 474 (1989). The standard for a certiorari action varies according to the nature of the action that is sought. T.D.J Dev. Corp. v. Conservation Comm’n of N. Andover, 36 Mass.App.Ct. 124, 128 (1994).
The Plaintiffs seek certiorari review of the Commission’s March 21, 2008 OOC, which is conditioned upon compliance with the Commission’s special conditions of approval. The plaintiffs contend that the DEP’s superseding OOC preempts the Commission’s OOC, or, alternatively, that the Commission’s decision is arbitrary and capricious and based on an ad hoc agenda against the construction of piers. After review of the record, the court finds that the Commission’s decision is arbitrary and capricious, and furthers an ad hoc agenda.
I. Superseding Order of Conditions
The plaintiffs argue the WPA governs the construction of their proposed pier because the Bylaw fails to establish more stringent standards for the protected areas located on the premises. Accordingly, the plaintiffs contend that the DEP’s Superseding Order of Conditions preempts the Commission’s decision to deny their requests for variances from the Bylaw.
Massachusetts courts recognize that “municipalities may enact more stringent requirements than those provided by the WPA.” FIC Homes of Blackstone v. Conservation Comm’n of Blackstone, 41 Mass.App.Ct. 681, 685-87 (1997) (citations omitted); see also Golden v. Selectmen of Falmouth, 358 Mass. 519, 526 (1970) (recognizing that the WPA only establishes minimum standards). “A local authority has final determination regarding project applications when it acts pursuant to an ordinance or by-law which provides more stringent requirements than those provided by the act.” Healer v. Department of Envtl. Protection, 73 Mass.App.Ct. 714, 718 (2009) (citations omitted); FIC Homes of Blackstone, 41 Mass.App.Ct. at 687 (citations omitted) (holding that where the local authority’s decision is based on more protective regulations, the DEP’s Superseding OOC does not preempt a local authority’s decision-making power).
First, the court finds that Bylaw §§237-1 and 703 protect interests, including recreation, sedimentation and erosion, which are absent from the WPA. Second, the court finds that the Commission acted pursuant to three provisions of the Bylaw, §§703-4(J)(l), (J)(4), and (M)(2), that create more stringent standards than the WPA. In particular, the Commission denied the plaintiffs’ request for variances based on §§703-4(J)( 1) and (J)(4), which define pier length and channel width standards and are specifically designed to promote recreation, and §703-4(M)(2), which defines the berth depth standard and is designed to prevent sedimentation and erosion. Because the Commission denied the plaintiffs’ variance requests based on the Bylaw’s more stringent provisions, the DEP’s superseding OOC does not preempt the Commission’s decision.
II. Certiorari Review
The plaintiffs contend that even if the Bylaw governs, the Commission’s decision to deny their requests for variances is arbitrary and capricious, and in fur *154 therance of an ad hoc agenda against construction of piers.
A) Arbitrary & Capricious
“A decision is not arbitrary and capricious unless there is no ground which ‘reasonable [persons] might deem proper’ to support it.” T.D.J. Dev. Corp., 36 Mass.App.Ct. at 128. In reviewing the record, the court recognizes that applicants have no legal right to a variance. FIC Homes of Blackstone, Inc., 41 Mass.App.Ct. 681, 686 (1996). The court also recognizes that “(t]he Commission is better suited than the court to analyze the special circumstances presented by the applicants in granting a variance.” Pendergast v. Board of Appeals of Barnstable, 331 Mass. 555, 557-58 (1954). This is especially true “(i]f the agency has, in the discretionary exercise of its expertise, made a ‘choice between two fairly conflicting views,’ and its selection reflects reasonable evidence, ‘[a] court may not displace [the agency’s] choice.’ ” Conservation Comm'n of Falmouth v. Pacheco, 49 Mass.App.Ct. 737, 739 n.3 (2000).
Although the Commission is entitled to great deference with regard to the grant or denial of a variance, its decision cannot be characterized as a “choice between two fairly conflicting views” based on “reasonable evidence.” Here, the plaintiffs provided great detail about the premises’ unique characteristics, including its atypical dimensions, its inability to support shellfish or shorebird habitat, its location near a dead-end cove, and its extremely shallow water depth. When faced with these considerations, the only reasoning that the Commission provided for the denial of the plaintiffs’ variances was “. . . that adherence to the Regulations is the best way to minimize downstream impacts to the high-value shellfish habitat in the Centerville River.” The Commission’s desire to protect downstream shellfish habitat does conflict with the plaintiffs’ interest in constructing a pier, but it is unreasonable in light of the evidence in the record.
Here, the record contains only vague references to the proposed project’s impact on downstream habitat. First, the plaintiffs’ application states that the area surrounding the premises has a shellfish habitat value of “0" and that the nearest viable shellfish habitat is approximately 2,750 feet downstream. Second, the public hearing minutes reveal that the Commission recognized that the proposed construction site was located in a dead-end cove that lacked flow capable of flushing pollutants downstream. This conclusion about lack of flow seems to suggest that the proposed project would have little, if any, impact on downstream habitat. Considering the evidence in the record, the Commission’s decision to deny the plaintiffs’ variances based on a strategy to minimize impact on downstream shellfish habitat is unreasonable, and consequently arbitrary and capricious.
B) Ad Hoc Agenda
Finally, the plaintiffs argue that the Commission denied their variance requests based on an ad hoc agenda against the construction of piers, rather than the standards set forth in the Bylaw. In support of this argument, the plaintiffs state that the Commission’s reasons for denying their variance requests are not based on the Bylaw, and the court agrees.
The court’s review of the record establishes that the Commission failed to act in accordance with the Bylaw. “If the agency has acted for reasons that are extraneous to the prescriptions of the regulatory scheme, but are related, rather, to an ad hoc agenda, then that agency has acted arbitrarily because the basis for that action is not uniform, and it follows, is not predictable.” Fafard v. Conservation Comm’n of Reading, 41 Mass.App.Ct. 565, 568 (1996). Here, the record includes detailed discussion of the fact that no variances have been issued since the adoption of the Bylaw, which supports the plaintiffs’ contention that the Commission has an agenda against new construction. Further, as discussed in Section A, the Commission’s written findings supporting the plaintiffs’ OOC for a modified pier are based on facts not reasonably supported by the evidence. Finally, comments made during the March 8, 2008 public hearing show that the Commission focused on criteria not contained under the Bylaws, namely a desire to prevent the Centerville River from becoming a “parking lot for boats.” Under these circumstances, the court finds that the Commission engaged in an ad hoc agenda against the construction of piers.
ORDER
For the foregoing reasons, the plaintiffs’ Motion for Judgment on the Pleadings is ALLOWED, and the decision is remanded to the Commission for further findings.

The court’s decision under certiorari review eliminates the need for further review.

Strict application of §703-4(J)(l) limits the length of the plaintiffs’ proposed pier to thirty feet, which is five feet shorter than what the plaintiffs requested. Section 703-4(J)(4) further limits the length of the plaintiffs’ pier to 50 feet, a distance forty feet shorter than what the plaintiffs proposed. Finally, §703-4(M)(2) requires a berth depth of 12 inches; however, the water is only twenty inches deep at low tide at the end of the proposed float where the plaintiffs plan to berth a motorized boat. Consequently, the plaintiffs requested a variance reducing the berth depth standard from twelve to seven inches.

A rating of “0" suggests that an area has no viable shellfish habitat, whereas a rating of ”4" indicates that the area supports significant shellfish habitat.

The plaintiffs concede that many of the existing piers predate the Bylaw, which was adopted in 2004.

This court (Rufo, J.) allowed the plaintiffs to expand the administrative record to include the superseding order of conditions, but did not rule as to whether the reviewing court should consider this document during certiorari review. The Commission argues that the court should omit this document from its review because it was not part of the Commission’s decision-making process, and the plaintiffs did not file a second application with the Commission upon its receipt.